**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| ROBERT KASHINSKY; JONTELL PLATTS; WITOLD KWIATKOWSKI; GINA DIFAZIO; JEREMY MOODY; RACING RAILS LLC d/b/a LEGEND FIREARMS; LEGACY INDOOR RANGE AND ARMORY LLC; NEW JERSEY SECOND AMENDMENT SOCIETY; FIREARMS POLICY COALITION, INC.; and SECOND AMENDMENT FOUNDATION, INC., | : : : : : : : : : : : | No. 3:20-cv-03127-MAS-ZNQ |
| Plaintiffs, | : : | |
| v. | : : | |
| PHILIP D. MURPHY, in his official capacity as Governor of the State of New Jersey; and PATRICK J. CALLAHAN, in his official capacity as State Director of Emergency Management and as Superintendent of the New Jersey State Police, | : : : : : : : | |
| Defendants. | : : : : | |

## PLAINTIFFS' BRIEF IN SUPPORT OF A PRELIMINARY INJUNCTION AND/OR TEMPORARY RESTRAINING ORDER

Adam Kraut, Esq.
FIREARMS POLICY COALITION, INC.
1215 K Street, 17th Floor
Sacramento, California 95814
Tel: 916.476.2342
akraut@fpclaw.org
*Pro Hac Vice* Motion Forthcoming

David D. Jensen, Esq.
DAVID JENSEN & ASSOCIATES
33 Henry Street
Beacon, New York 12508
Tel: 212.380.6615
david@djensenpllc.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. *ii*

INTRODUCTION .............................................................................................. 1

PERTINENT FACTS, STATUTES & REGULATIONS ....................................... 2

    A.    To Obtain a Firearm, a Person Must Appear in Person at a Licensed Premises, and There Must Be a Background Check ........................... 3

    B.    Executive Order 107 and the Shutdown of the State Police Background Check Portal ................................................................. 5

    C.    Injury to the Plaintiffs ........................................................................ 6

ARGUMENT ...................................................................................................... 8

    I)    The Plaintiffs are Likely to Succeed on the Merits ............................ 9

    II)    An Injunction is Needed to Prevent Irreparable Injury ..................... 17

    III)    An Injunction Will Not Harm Other Interested Persons ................... 18

    IV)    The Protection of Constitutional Rights is in the Public Interest ....... 21

CONCLUSION .................................................................................................. 22

## **TABLE OF AUTHORITIES**

**Cases**

*American Civil Liberties Union v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003),
    *aff'd*, 542 U.S. 656 (2004)................................................................21

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney General of New Jersey*,
    910 F.3d 106 (3d Cir. 2018) ................................................14

*Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012) ....................................15-17

*Board of Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987)..........................12

*Delaware River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917
    (3d Cir. 1974) ................................................................8

*District of Columbia v. Heller*, 554 U.S. 570 (2008)...........................................*passim*

*Drake v. Filko*, 724 F.3d 426 (3d Cir.2013)................................................14

*Elrod v. Burns*, 427 U.S. 347 (1976) ................................................18

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ................................18-20

*FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) ................................15

*Forchion v. Intensive Supervised Parole*, 240 F. Supp. 2d 302 (D.N.J. 2003)..........................21

*GJJM Enterprises, LLC v. Atlantic City,* 293 F. Supp. 3d 509 (D.N.J. 2017) ..........................18

*Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016)................................18

*LCN Enterprises, Inc. v. City of Asbury Park*, 197 F. Supp. 2d 141 (D.N.J. 2002)....................22

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................9-12, 22

*National Socialist Party of America v. Skokie*, 432 U.S. 43 (1977)..........................12

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017)................................8

*Silvester v. Becerra*, 138 S. Ct. 945 (2018)................................................22

*Skokie v. Nat'l Socialist Party*, 373 N.E.2d 21 (Ill. 1978) ................................13

*Stilp v. Contino*, 613 F.3d 405 (3d Cir. 2010) ................................18

*Teixeira v. County of Alameda*, 822 F.3d 1047 (9th Cir. 2016)................................12

*United States v. Carolene Products Co.*, 304 U.S. 144 (1938)................................13

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2009)...........................*passim*

*United States v. Playboy Entertainment Group*, 529 U.S. 803 (2000)................................15

**Statutes**

18 U.S.C. § 922 ................................................................4

26 U.S.C. § 5845................................................................4

Chicago, Ill., Municipal Code § 8–20–040 (2009)................................10

Chicago, Ill., Municipal Code § 8–20–050 (2009) ...................................................... 10

D.C. Code § 7-2502.01 (2001) ....................................................................................... 9

N.C. Gen. Stat. § 14-288.7 ............................................................................................ 16

N.C. Gen. Stat. § 14-288.12 .......................................................................................... 16

2018 N.J. Laws c. 36, § 1 ................................................................................................ 3

N.J.S.A. § 2C:58-3 ........................................................................................................... 3

## **Other Authorities**

A. 2757, 218th Leg. (N.J. 2018) ..................................................................................... 4

Arizona Executive Order 2020-12 ................................................................................ 20

ATF Office of Enforcement Programs and Services, Permanent Brady Permit Chart,
 *available at* https://www.atf.gov/rules-and-regulations/permanent-brady-permit-chart
 (last visited Mar. 24, 2020) ...................................................................................... 4

Connecticut Executive Order 7H .................................................................................. 20

FBI Criminal Justice Information Services, *About NICS*, *available at*
 https://www.fbi.gov/services/cjis/nics/about-nics (last visited Mar. 24, 2020) ........ 5

Governor Wolf's Industry Operation Guidance, *available at*
 https://www.scribd.com/document/452553026/UPDATED-2-30pm-March-24-2020-
 Industry-Operation-Guidance (last visited Mar. 25, 2020) ..................................... 21

Louisiana proclamation Number 33 JBE 2020 ............................................................ 20

N.J. Executive Order 107, *available at* https://nj.gov/infobank/eo/056murphy/pdf/
 EO-107.pdf (last visited Mar. 24, 2020) ............................................................... 5-6

Virginia Executive Order Number 53 ........................................................................... 20

West Virginia Executive Order No. 9-20 ..................................................................... 21

Winston Williams, *New Law Swells Chicago Pistol Registrations*, N.Y. Times,
 Apr. 9, 1982, at A16, *available at* https://www.nytimes.com/1982/04/09/us/
 new-law-swells-chicago-pistol-registrations.html (last visited Mar. 24, 2020) ...... 10

## **Regulations**

27 C.F.R. § 478.100 ........................................................................................................ 5

27 C.F.R. § 478.102 ..................................................................................................... 4-5

27 C.F.R. § 478.96 .......................................................................................................... 5

N.J.A.C. § 13:54-3.4 ....................................................................................................... 5

N.J.A.C. § 13:54-3.12 ..................................................................................................... 4

N.J.A.C. § 13:54-3.13 ..................................................................................................... 4

N.J.A.C. § 13:54-3.19 ..................................................................................................... 4

N.J.A.C. § 13:54-1.2 ................................................................................................................4

## **INTRODUCTION**

On March 21, 2020, Governor Murphy and Colonel Callahan *entirely closed off* any and all means for law-abiding private citizens to obtain firearms in New Jersey. At the same time these Defendants took this action, they have permitted numerous other retail businesses to continue their operations under limited conditions—meaning that this is not a situation where it is simply not possible to allow any retail businesses whatsoever to continue operation. Rather, the State has permitted the retailers of many other products—including alcohol, marijuana, and office supplies—to continue distributing goods to the public.

The Defendants' actions have a particularly significant impact because in the State of New Jersey the *only* way a person can obtain a firearm is by means of a transaction consummated at the premises of a licensed gun dealer. Closing all gun stores, without exception, results in a situation where it is illegal to purchase a gun. Period.

To be sure, the COVID-19 outbreak is an existential threat that requires significant sacrifices and adjustments by all people, regardless of their views on firearms (or anything else). But no interest, no matter how compelling it may be, can justify the elimination of constitutional rights. Governor Murphy could not cite the seriousness of COVID-19 to justify bans on speech or reading, nor would the COVID-19 outbreak justify convicting people of crimes without providing them

with trials, or searching houses door-to-door without warrants. The Constitution imposes a floor the government cannot go beneath. In crafting emergency orders to address threats, including very serious ones, the government must take care to ensure that it does not go too far.

Here, by completely prohibiting the acquisition of firearms, the government has gone too far—and this Court's relief is needed to remedy an irreparable injury that exists right now.

## PERTINENT FACTS, STATUTES & REGULATIONS

This section of the brief shows that it is now impossible for a private citizen to purchase any type of conventional firearm (handgun, rifle, or shotgun) in the State of New Jersey. As explained herein:

- Any person wishing to purchase a gun in New Jersey must use the services of a licensed dealer;

- The person must meet the dealer at the dealer's licensed premises; and

- The licensed dealer must be able to complete a federal background check.

It has accordingly become impossible to purchase a firearm because Executive Order 107 prohibits dealers from being "open to the public" under any set of circumstances. And even if it did not, the Division of State Police has made the

background check system unavailable to "licensed retail dealers," which in and of itself makes completing a purchase impossible.

### A.   To Obtain a Firearm, a Person Must Appear in Person at a Licensed Premises, and There Must Be a Background Check

To be sure, laws regulating the purchase of firearms are complex and require a purchaser and "licensed retail dealer" to follow applicable state and federal laws. In order to purchase a firearm in New Jersey, a person must obtain prior authorization from local police authorities. For a rifle or shotgun, a person must obtain a Firearms Purchaser Identification card ("FPID"), and to purchase a handgun, a person must obtain a Permit to Purchase. *See* N.J.S.A. § 2C:58-3(a)-(b). To obtain either a FPID or Permit to Purchase, a person must submit fingerprints and pass a background check investigation conducted by local police authorities. *See* N.J.S.A. § 2C:58-3(e)-(f). Police cannot issue a FPID or Permit to Purchase to any person who, *inter alia*, has been convicted of a crime, confined to a mental institution, subjected to a restraining order, or who is under the age of 18 (for an FPID) or 21 (for a Permit to Purchase). *See id.* § 2C:58-3(c). A Permit to Purchase authorizes the purchase of a single handgun and is valid for 90 days (with one renewal possible), while a FPID is valid indefinitely. *See id.* § 2C:58-3(f).

Since 2018, New Jersey law has mandated that all firearms transactions take place "through a licensed retail dealer." *See id.* § 2C:58-3(a)(2), (b)(2); *see also* 2018 N.J. Laws c. 36, § 1. Thus, if an appropriately licensed person wishes to

purchase a firearm from a friend, neighbor, or relative, a "licensed retail dealer" is

necessary to complete the transaction. Federal law requires any licensed retail

dealer to conduct a background check using the National Instant Criminal

Background Check System "before the completion of the transfer." *See* 18 U.S.C.

§ 922(t)(1)-(2). There are three exceptions to this requirement, but none have any

application to an individual attempting to purchase a rifle, shotgun, or handgun in

New Jersey. *See id.* § 922(t)(3).[1] The State Legislature's stated purpose in enacting

the 2018 legislation was to "[r]equire[] background checks for private gun sales."

A. 2757, 218th Leg. (N.J. 2018). And significantly, it is the Division of State

Police that conducts point-of-sale background checks in New Jersey. *See* N.J.A.C.

§§ 13:54-1.2, -3.12, -3.13(a)(6), -3.19; *see also* 27 C.F.R. § 478.102(b). In many

other states, licensed firearms dealers contact the FBI (or its designated contractor)

---

[1] One exception applies where a purchaser has a state-issued "license or permit" that meets certain requirements. *See* 18 U.S.C. § 922(t)(3)(A). New Jersey's gun licenses do not meet these requirements. *See* ATF Office of Enforcement Programs and Services, Permanent Brady Permit Chart, *available at* https://www.atf.gov/rules-and-regulations/permanent-brady-permit-chart (last visited Mar. 24, 2020). The second exception applies where the federal government has approved a transfer under the National Firearms Act ("NFA"), which governs things like machineguns, howitzers and short-barreled shotguns, not "ordinary" rifles, shotguns and handguns. *See* 18 U.S.C. § 922(t)(3)(B); 26 U.S.C. § 5845(a) ("firearm" definition for NFA purposes). Finally, the third exception applies in "extremely remote" areas where there is "an absence of telecommunications facilities" and the Attorney General "has certified that compliance . . . is impracticable." *See id.* § 922(t)(3)(C).

to perform point-of-sale background checks. *See generally* FBI Criminal Justice

Information Services, *About NICS, available at*

https://www.fbi.gov/services/cjis/nics/about-nics (last visited Mar. 24, 2020). In

New Jersey, licensed dealers use a website portal established by the Division of

State Police (at https://www.njportal.com/NJSP/NicsVerification/).

Finally, federal law requires an individual to "appear in person at the

licensee's business premises" in order to purchase a firearm. *See* 27 C.F.R. §

478.96(b). The only exception is where a background check is not required (*e.g.*

for a transaction in an "extremely remote" area with no telephone service). *See id.*;

*see also* 27 C.F.R. § 478.102(a), (d).[2]

## B.   Executive Order 107 and the Shutdown of the State Police Background Check Portal

Governor Murphy issued Executive Order 107 on the evening of March 21,

2020. *See* Executive Order 107, *available at*

https://nj.gov/infobank/eo/056murphy/pdf/EO-107.pdf (last visited Mar. 24, 2020).

The order identifies various types of "retail businesses" as being "essential," and it

further provides that "[t]he brick-and-mortar premises of all non-essential retail

---

[2] Federal law includes an exception that allows licensed dealers to transact business at gun shows—which would still require them to appear in person and complete a background check—but New Jersey independently prohibits firearms dealers from doing business at gun shows. *See* 27 C.F.R. § 478.100; N.J.A.C. § 13:54-3.4(e).

businesses must close to the public as long as this Order remains in effect." *Id.* at ¶ 6. The "essential" retail businesses include convenience stores, liquor stores, marijuana dispensaries, dry cleaners and office supply stores. *Id.* These "essential" businesses can remain open to the public, but they must "abide by social distancing practices to the extent practicable" such as making "all reasonable efforts to keep customers six feet apart and frequent use of sanitizing products on common surfaces." *Id.* at ¶ 7. Executive Order 107 did not include licensed firearms dealers in its list of "essential" businesses, *see id.* at ¶ 6, and they therefore must be "close[d] to the public" for the duration of the order.

Shortly after Governor Murphy issued the order, the Division of State Police changed the portal that is used for conducting background checks so that it was impossible to submit any additional background checks. Furthermore, the Division of State Police posted a notice stating that it would process the background checks that had been submitted to it up to and including Thursday, March 19, 2020, but that it would not process background checks that had been submitted on Friday and Saturday, March 20-21, 2020, and all of these background checks remain pending at the present time.

### C.    Injury to the Plaintiffs

The plaintiffs in this action are five individuals who are all licensed to purchase firearms, and who would like to do so in order to protect themselves and

their families from harm. Three of these five individuals do not own any guns, so the actions complained of in this lawsuit stand as a complete bar to them having any ability to protect themselves using modern small arms. Two of the plaintiffs in this action are licensed firearms dealers that are unable to complete transactions with willing customers as a result of the actions complained of. These firearms dealers seek to conduct business in a manner that will be unlikely to spread the coronavirus further, such as by conducting all business except for firearms transfers online or by phone, and by operating in a manner consistent with other "essential businesses" (*i.e.* taking reasonable efforts to keep customers six feet apart, frequent use of sanitizing products on common surfaces, etc.) or only meeting individual firearms purchasers in private appointments. Finally, the remaining plaintiffs are not-for-profit organizations that represent the interests of their New Jersey members and other people who are injured by Executive Order 107 and the State Police's shutdown of its background check portal.

## **ARGUMENT**

Equitable relief is necessary to prevent irreparable injury, and the Plaintiffs readily meet the standards for preliminary equitable relief. As the Court is aware, preliminary equitable relief requires a "threshold" showing that: (1) there is "'a reasonable probability of eventual success in the litigation'"; and (2) "'it will be irreparably injured . . . if relief is not granted.'" *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (*quoting Delaware River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)) (alteration in source). After this, a court balances these two factors along with, "when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id.* (*quoting Del. River Port Auth.*, 501 F.2d at 920).

The Plaintiffs plainly meet the two "threshold" considerations—"a reasonable probability of eventual success in the litigation" and the existence of irreparable injury "if relief is not granted"—because categorical bans on acquiring arms are flatly unconstitutional, and because the denial of a constitutional right to engage in conduct is irreparable *per se*. The other two factors—the possibility of harm to others, as well as the public interest, which (again) are only considered "when they are relevant"—also weigh strongly in favor of equitable relief. Put

simply, irreparable injury exists now, and it will continue to exist unless *and until* the Court grants relief.

### I) The Plaintiffs are Likely to Succeed on the Merits

The Plaintiffs are likely to succeed on the merits because categorical bars on the ability to acquire firearms are *per se* unconstitutional. These are precisely the types of laws that the Supreme Court overturned in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

In *Heller*, the Supreme Court invalidated a District of Columbia law that substantively provided that "the registration of handguns is prohibited." *Id.* at 575. Specifically, the District of Columbia Code made it illegal to, *inter alia*, "possess" a gun in the absence of a "registration certificate," D.C. Code § 7-2502.01(a) (2001), and it then provided that "[a] registration certificate shall not be issued for a . . . [p]istol not validly registered to the current registrant in the District prior to September 24, 1976," *id.* § 7-2502.02(a)(4). The Court's conclusion was that "[a]ssuming that [the petitioner] is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun[.]" *Heller*, 554 U.S. at 635. Furthermore, the District's law was unconstitutional without regard to the standard of scrutiny. "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights," a ban on handguns "would fail constitutional muster." *Id.* at 628-29.

In *McDonald* the Supreme Court likewise overturned a Chicago law that "prohibits registration of most handguns, thus effectively banning handgun possession by almost all private citizens who reside in the City." *Id.* at 750. Specifically, Chicago made it illegal to "possess . . . any firearm unless [a] person is the holder of a valid registration certificate," Chicago, Ill., Municipal Code § 8–20–040(a) (2009), and then it simultaneously provided that "[n]o registration certificate shall be issued for any . . . handguns," *id.* § 8–20–050(c). Finding the Second Amendment applicable against state and local governments, the Court reversed the lower court decisions that had granted the city's motion to dismiss. *McDonald*, 561 U.S. at 791.

While there is some debate about the full import of the decisions in *Heller* and *McDonald*, this much is irreducible: The local laws that the Court invalidated were not, strictly speaking, laws that completely "banned" handguns. Rather, they were laws that prohibited people from acquiring additional handguns. People remained free to keep handguns they had registered in the District of Columbia before 1976, and in the City of Chicago before 1982.[3] The restrictions that the

---

[3] Notably, many Chicago residents made it a point to acquire handguns before the city's ban went into force in 1982. *See* Winston Williams, *New Law Swells Chicago Pistol Registrations*, N.Y. Times, Apr. 9, 1982, at A16, *available at* https://www.nytimes.com/1982/04/09/us/new-law-swells-chicago-pistol-registrations.html (last visited Mar. 24, 2020).

Court found invalid "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," *Heller*, 554 U.S. at 628, were laws that prohibited otherwise eligible individuals from *acquiring* handguns, *even though they allowed people to keep handguns they already owned*. It is those laws that, under *Heller* and *McDonald*, are *per se* unconstitutional.

The Court of Appeals for the Third Circuit has itself recognized that the Second Amendment cannot tolerate a prohibition on selling guns. In *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2009), the court evaluated the import of *Heller* and, particularly, of three examples of regulations that the Court explained it had not intended "to cast doubt on." *See id.* at 91-92 (*quoting Heller*, 554 U.S. at 626). Those were "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27. The Third Circuit concluded that the first two types of restrictions were "exceptions to the right to bear arms" and accordingly outside of its scope. *See Marzzarella*, 614 F.3d at 91. But it qualified that "[c]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment" because if so "it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. *Such a result would be untenable under Heller*." *Id.* at 92 n.8

-11-

(emphasis added). And notably, the Court of Appeals for the Ninth Circuit agrees that "a total prohibition on the commercial sale of firearms" is "'untenable under *Heller*.'" *Teixeira v. County of Alameda*, 822 F.3d 1047, 1057 (9th Cir. 2016) (*quoting Marzzarella*, 614 F.3d at 92 n.8). But the State of New Jersey has done more than create a "total prohibition on the commercial sale of firearms"; the State's actions are actually more egregious because they prohibit the sale of firearms in any manner, whether "commercial" or not.

The restrictions that the Defendants have imposed here are invalid for the same reasons that the laws in *Heller* and *McDonald* were invalid—indeed, just as the Third Circuit articulated in *Marzzarella*. These restrictions are invalid *per se* because they prohibit something that may not be prohibited—the exercise of constitutional rights deemed fundamental—and it is not necessary to resort to tiers of scrutiny to evaluate them. One notable example is *Board of Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987), where the Court struck down an LAX airport policy that prohibited (literally) all "First Amendment activities" on LAX property. *See id.* at 575. The unanimous Court declined to address the standard of review, explaining simply that "no conceivable governmental interest would justify such an absolute prohibition of speech." *Id.*

Another pertinent example is *National Socialist Party of America v. Skokie*, 432 U.S. 43 (1977), where the Supreme Court summarily overturned a lower court

decision that had enjoined a neo-Nazi group from parading through a town. *See id.* at 44; *see also Heller*, 554 U.S. at 635. Few would dispute that a (substantially Jewish) community has compelling public safety reasons for trying to stop a neo-Nazi group from parading, displaying swastikas, and distributing literature—but these safety reasons were insufficient to override the enumerated right of free speech. *See Skokie v. Nat'l Socialist Party*, 373 N.E.2d 21, 22 (Ill. 1978). The Court's decision in *Heller* cited *Skokie* and explained that there, the Court had refused to "apply an 'interest-balancing' approach to the prohibition of a peaceful neo-Nazi march through Skokie." *Heller*, 554 U.S. at 635. There is no exception in "the freedom-of-speech guarantee that the people ratified . . . for the expression of extremely unpopular and wrong-headed views. *The Second Amendment is no different.*" *Id.* (emphasis added).

There, as here, a flat prohibition on the exercise of an enumerated constitutional right is unconstitutional on its face. No amount of interest-balancing will remove a right from the Constitution. Laws that simply preclude protected activities do not require resort to any standard of review.

Most decisions addressing burdens on the right to keep and bear arms have used the tiered scrutiny approach that has its genesis in the Court's well known *Carolene Products* footnote. *See generally United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938) (suggesting a "more exacting judicial scrutiny"

-13-

"when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten Amendments"). The Third Circuit's decision in *Marzzarella* explains that a burden on free speech "is susceptible to several standards of scrutiny, depending upon the type of law challenged and the type of speech at issue"—and that there is "no reason why the Second Amendment would be any different." *Marzzarella*, 614 F.3d at 96-97. Thus, "[i]f the core Second Amendment right is burdened, then strict scrutiny applies; otherwise, intermediate scrutiny applies." *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney General of New Jersey*, 910 F.3d 106, 117 (3d Cir. 2018) (*citing Drake v. Filko*, 724 F.3d 426, 436 (3d Cir.2013)); *see also Marzzarella*, 614 F.3d at 97 (whether a law "severely limit[s] the possession of firearms").

The "core" Second Amendment right that the Third Circuit referenced in *Association of New Jersey Rifle & Pistol Clubs* is "to allow 'law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Ass'n of New Jersey Rifle & Pistol Clubs*, 910 F.3d at 115 (*quoting Heller,* 554 U.S. at 635). The shutdown order and restrictions at issue here preclude law-abiding citizens from obtaining arms to use in defense of hearth and home, thus striking at the very core of the Second Amendment. For without the ability to *obtain* arms, the right to *keep* them is illusory and meaningless. Here, as in *Heller, Board of Airport Commissioners,* and *Skokie,* the Defendants' actions have precluded the exercise of

-14-

an enumerated constitutional right and no interest balancing test need be applied. Their actions patently offend the Plaintiffs' Second Amendment rights. However, should this Court apply a tiered standard of scrutiny, it must be a strict one.

Under a strict scrutiny approach, a law must be "'narrowly tailored to serve a compelling state interest.'" *Marzzarella*, 614 F.3d at 99 (*quoting FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 465 (2007)). Moreover, the law is presumed to invalid, with "the government bear[ing] the burden of rebutting that presumption." *Id.* (*citing United States v. Playboy Entertainment Group*, 529 U.S. 803, 817 (2000)). The burden at issue here—a categorical ban on the acquisition of arms by the law-abiding—cannot be sustained under this standard.

Concededly, preventing the spread of a pandemic illness is a compelling government interest. But nothing makes a blanket ban on gun acquisition "necessary" to achieve that interest—and moreover, the burden of a blanket closure is very plainly not narrowly tailored. If the State can establish conditions that safely permit people to purchase alcohol, marijuana, and office supplies, and to take their clothes to the dry cleaner, then it can establish conditions that safely permit people to enter gun stores and receive delivery of firearms. There is no reason for this arbitrary treatment, let alone one that could withstand the rigors of heightened constitutional scrutiny. The fact that many other states have exempted

firearms retailers from their closure orders, *see infra* Point III, only underscores the fact that the approach the State of New Jersey has taken is not narrowly tailored.

The decision in *Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012), is instructive. That case concerned North Carolina laws providing that during a state of emergency it was illegal "to transport or possess off [one's] own premises any dangerous weapon," and further, that government officials could prohibit or restrict "the possession, transportation, sale, purchase, storage, and use of dangerous weapons and substances." *See id.* at 711 (*quoting* N.C. Gen. Stat. §§ 14-288.7, 14-288.12(b)). The court concluded that even though the "state of emergency" prohibitions "may be limited in duration," they "strip peaceable, law abiding citizens of the right to arm themselves in defense of hearth and home, striking at the very core of the Second Amendment." *Id.* at 716. Thus, the laws at issue, "much like those involved in *Heller*, are at the 'far end of the spectrum of infringement on protected Second Amendment rights.'" *Id.* (*quoting Marzzarella*, 614 F.3d at 97).

The court accordingly applied a strict scrutiny standard of review. *See id.* at 715. And under that standard, "the emergency declaration statutes are presumed invalid, and defendants bear the burden of rebutting that presumption by showing that the laws are narrowly tailored to serve a compelling government interest." *Id.* at 716. The court found that while there was a compelling interest in public safety

-16-

and crime prevention, the state-of-emergency restrictions were not narrowly tailored to serve that interest. *See id.* Specifically, "[t]hey do not target dangerous individuals or dangerous conduct. Nor do they seek to impose reasonable time, place and manner restrictions by, for example, imposing a curfew to allow the exercise of Second Amendment rights during circumscribed times." Rather, they "effectively ban[]" the public "from engaging in conduct that is at the very core of the Second Amendment at a time when the need for self-defense may be at its very greatest." *Id.* (*citing Heller*, 554 U.S. at 595). The court accordingly had no choice but to conclude that the restrictions were invalid as-applied. *Id.*

As the Supreme Court itself recognized in *Heller*, "[w]e know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Heller*, 554 U.S. at 634. So, while the forced closure of all gun retailers in the State would fail to pass constitutional muster under a standard-of-scrutiny based review, the reality is that any standard of review would be inappropriate to use because a blanket ban on obtaining arms is flatly unconstitutional without regard to the interests cited.

-17-

## II)  An Injunction is Needed to Prevent Irreparable Injury

Like the First Amendment, the Second Amendment secures the right to engage in affirmative conduct—to (for example) speak, exercise a religion, or keep and bear arms. *Cf. Marzzarella*, 614 F.3d at 89 n.4 ("[W]e look to other constitutional areas for guidance in evaluating Second Amendment challenges. We think the First Amendment is the natural choice."). As such, a deprivation of Second Amendment rights is an injury that, by its very nature, is irreparable. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). The enumeration of constitutional rights gives people the right to enjoy them in fact, not through the fiction of a compensatory money damages judgment. *See Ezell*, 651 F.3d at 699 ("Infringements of this right cannot be compensated by damages."). Thus, the only real issue is whether there is probable success on the merits of the constitutional claim, for if there is, any injury will be irreparable. *See Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010); *GJJM Enterprises, LLC v. Atlantic City,* 293 F. Supp. 3d 509, 520–21 (D.N.J. 2017); *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 149 (D.D.C. 2016). And as demonstrated *supra*, Plaintiffs' probability of success on the merits is overwhelmingly in their favor, as a categorical ban on acquiring arms is flatly unconstitutional. Thus, the injury that

-18-

Plaintiffs' suffer and will continue to suffer in the absence of an injunction is irreparable.

### III)  An Injunction Will Not Harm Other Interested Persons

This Court's injunction will only apply to individuals who have already obtained FPIDs and/or Permits to Purchase from local police authorities. And as previously explained, those authorities had a legal obligation to "investigate" applications and refuse licensure to unsafe or disqualified individuals. Thus, anyone who is able to purchase a firearm following this Court's order will have gone through, and passed, a substantial vetting process that is focused on whether their possession of firearms would be contrary to the public interest.[4] Allowing these people to purchase firearms notwithstanding the Defendants' attempts to ban gun sales will not significantly undercut the State's overarching goal in requiring background checks in the first place. Furthermore, Plaintiffs would still have to undergo *another* background check in order to actually take possession of a firearm. Of course, the State cannot cite the existence of civilian gun ownership as

---

[4] We do not mean to suggest that a State *without* a licensing or permitting system for the acquisition of guns would be free to close off all legal channels for the acquisition of guns. Rather, we wish to highlight that, on the facts presented here, the people who would benefit are people who have already passed background checks and have to pass yet another background check for the transfer of a firearm.

a "harm" because the decision has already been made—over 200 years ago—to protect this activity.

Notably, in *Ezell* the City of Chicago argued that the balance of equities was against injunctive relief (in the form of an order requiring the city to allow gun ranges) because there were no regulations in place that would govern the operation of ranges in the city. See *Ezell*, 651 F.3d at 710. The court rejected this argument, explaining that "[*p*]*roperly regulated* firing ranges . . . should not pose significant threats to public health and safety." *Id.* (emphasis added). Indeed, any claimed need for additional laws and regulations would not be a basis for denying an injunction, as legislative bodies retain their ability to adopt such regulations. *See id.* at 711.

That is particularly the case here, where multiple other states impose "shelter at home"-type restrictions to address the coronavirus have been able to craft proposals that did not totally foreclose access to firearms retailers. For example, the States of Arizona, Connecticut, Illinois, Louisiana, Virginia, and West Virginia have all adopted state-of-emergency restrictions that still permit firearms retailers to conduct business under some set of circumstances. *See* Arizona Executive Order 2020-12 at ¶ 3(e)(xv) (specifically exempting "firearm and ammunition suppliers and retailers for purposes of safety and security"); Connecticut Executive Order

-20-

7H;[5] Illinois Executive Order 2020-10 at ¶ 12(n) (specifically exempting "firearm and ammunition suppliers and retailers for purposes of safety and security."); Louisiana proclamation Number 33 JBE 2020;[6] Virginia Executive Order Number 53 at ¶ 6 ("any brick and mortar retail business not listed in paragraph 5 may continue to operate but must limit all in-person shopping to no more than 10 patrons per establishment."), and West Virginia Executive Order No. 9-20 at ¶ 3(r) (finding "firearm and ammunition suppliers and retailers" essential businesses). The neighboring State of Pennsylvania had prohibited gun stores from operating, but it recently amended its emergency order to allow firearms retailers to "operate physical businesses on a limited basis to complete only the portions of a sale/transfer that must be conducted in-person under the law[.]" *See* Governor Wolf's Industry Operation Guidance.[7]

---

[5] Further guidance available at https://portal.ct.gov/DECD/Content/Coronavirus-for-Businesses/Coronavirus-for-Businesses (specifically enumerating retail including "guns and ammunition" as essential). (Last visited March 25, 2020).

[6] Further guidance available at https://gov.louisiana.gov/assets/docs/covid/Essential-Infrastructure_fact-sheet.pdf (specifically enumerating "Firearm and ammunition suppliers and retailers for purposes of safety and security" as essential). (Last visited March 25, 2020).

[7] Available at https://www.scribd.com/document/452553026/UPDATED-2-30pm-March-24-2020-Industry-Operation-Guidance (last visited Mar. 25, 2020).

**IV)  The Protection of Constitutional Rights is in the Public Interest**

This consideration is readily met because "it is in the public interest for constitutional rights to be protected." *Forchion v. Intensive Supervised Parole*, 240 F. Supp. 2d 302, 310 (D.N.J. 2003) "[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law." *American Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003), *aff'd*, 542 U.S. 656 (2004). "The public interest generally favors such constitutional protection even in the face of otherwise important public interests." *LCN Enterprises, Inc. v. City of Asbury Park*, 197 F. Supp. 2d 141, 154 (D.N.J. 2002). If the Executive Order and practice at issue appear to be unconstitutional— as they do—then it is in the public interest to proscribe their enforcement.

## CONCLUSION

In 2010, the Supreme Court proclaimed that the Second Amendment was not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U.S. at 780. More recently, Justice Thomas lamented that lower courts "general[ly] fail[ed] to afford the Second Amendment the respect due an enumerated constitutional right." *Silvester v. Becerra*, 138 S. Ct. 945, 945 (2018) (Thomas, J., dissenting from denial of certiorari).

Plaintiffs have clearly demonstrated they are likely to prevail on the merits and have suffered an irreparable injury, for the actions of the Defendants have struck at the very core of their Second Amendment rights. The remaining factors necessary for preliminary relief give no quarter to the Defendants' actions either.

For the foregoing reasons, Plaintiffs respectfully ask that this Court grant their motion.

Dated:       March 26, 2020

<div style="margin-left:40%">

s/ David D. Jensen
David D. Jensen
DAVID JENSEN & ASSOCIATES
33 Henry Street
Beacon, New York 12508
Tel: 212.380.6615
Fax: 914.591.1318
david@djensenpllc.com

Adam Kraut, Esq.
FIREARMS POLICY COALITION, INC.
1215 K Street, 17th Floor
Sacramento, California 95814
Tel: 916.476.2342
akraut@fpclaw.org
*Pro Hac Vice* Motion Forthcoming

</div>